Michael R. Lozeau (State Bar No. 142893)
Douglas J. Chermak (State Bar No. 233382)
LOZEAU DRURY LLP
410 12th Street, Suite 250
Oakland, CA 94607
Tel: (510) 836-4200
Fax: (510) 836-4205 (fax)
E-mail: michael@lozeaudrury.com
        doug@lozeaudrury.com

Andrew L. Packard (State Bar No. 168690)
Megan Truxillo (State Bar No. 275746)
John J. Prager (State Bar No. 289610)
LAW OFFICES OF ANDREW L. PACKARD
100 Petaluma Boulevard North, Suite 301
Petaluma, CA 94952
Tel. (707) 763-7227
Fax: (707) 763-9227
E-mail: andrew@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>JEFFREY BEARD, in his official capacity as Secretary of the CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION,<br><br>　　　　　Defendant. | Case No. _____<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, by and through its counsel, hereby alleges:

## I.　　**JURISDICTION AND VENUE**

1.　　This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "the

Act").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.      On March 11, 2015, Plaintiff provided notice to Defendant of its violations of the Act, and of Plaintiff's intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the Regional Water Quality Control Board, Central Valley Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of CSPA's notice letter is attached as Exhibit A, and is incorporated by reference.

3.      More than sixty days have passed since notice was served on Defendant and the State and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.  This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Eastern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.  Pursuant to Local Rule 120, intradistrict venue is proper in Sacramento, California, because the source of the violations is located within Solano County.

II.      **INTRODUCTION**

5.      This complaint seeks relief for Defendant's discharges of polluted storm water from Defendant's industrial facility located at 2100 Peabody Road in Vacaville, California ("the Facility") in violation of National Pollutant Discharge Elimination System ("NPDES") Permit No. CA S000001, State Water Resources Control Board ("State Board") Order No. 92-12-DWQ as amended by Order No. 07-03-DWQ (hereinafter "General Permit").  Defendant's violations of the discharge,

treatment technology, monitoring requirements, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

6.      The failure on the part of persons and facilities such as Defendant and its industrial facility to comply with storm water requirements is recognized as a significant cause of the continuing decline in water quality of the Sacramento River and its tributaries, and other area receiving waters.  The general consensus among regulatory agencies and water quality specialists is that storm water pollution amounts to a substantial portion of the total pollution entering the aquatic environment each year.  In most areas of Solano County, storm water flows completely untreated through storm drain systems or other channels directly to the waters of the United States.

## III.    **PARTIES**

7.      Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA") is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Stockton, California.  CSPA has approximately 2,000 members who live, recreate and work in and around waters of the State of California, including the Sacramento River and its tributaries.  CSPA is dedicated to the preservation, protection, and defense of the environment, the wildlife and the natural resources of all waters of California.  To further these goals, CSPA actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

8.      Members of CSPA reside in and around the Delta and enjoy using the Sacramento River and its tributaries for recreation and other activities.  Members of CSPA use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.  Members of CSPA use those areas to fish, sail, boat, kayak, swim, bird watch, view wildlife and engage in scientific study including monitoring activities, among other things.  Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Permit.  The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

9.      Continuing commission of the acts and omissions alleged above will irreparably harm

COMPLAINT

1  Plaintiff and its members, for which harm they have no plain, speedy or adequate remedy at law.

2      10.    Defendant Jeffrey Beard is sued in his official capacity as Secretary of the California

3  Department of Corrections and Rehabilitation ("CDCR").  California Government Code section

4  12838.7 vests the Secretary of CDCR with the duty to assure CDCR's compliance with all federal

5  statutes and regulations.

6  **IV.**    **STATUTORY BACKGROUND**

7      11.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any

8  pollutant into waters of the United States, unless such discharge is in compliance with various

9  enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not

10  authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of

11  the Act, 33 U.S.C. § 1342.

12      12.    Section 402(p) of the Act establishes a framework for regulating municipal and

13  industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  States with

14  approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm

15  water discharges through individual permits issued to dischargers or through the issuance of a single,

16  statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(p).

17      13.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S.

18  EPA has authorized California's State Board to issue NPDES permits including general NPDES

19  permits in California.

20      14.    The State Board elected to issue a statewide general permit for industrial storm water

21  discharges.  The State Board issued the General Permit on or about November 19, 1991, modified

22  the General Permit on or about September 17, 1992, and reissued the General Permit on or about

23  April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

24      15.    In order to discharge storm water lawfully in California, industrial dischargers must

25  comply with the terms of the General Permit or have obtained and complied with an individual

26  NPDES permit.  33 U.S.C. § 1311(a).

27      16.    The General Permit contains several prohibitions and pollutant discharge limitations.

28  Discharge Prohibition A(1) of the General Permit prohibits the direct or indirect discharge of

COMPLAINT

materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to waters of the United States.  Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

17.     Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. BAT and BCT include both nonstructural and structural measures. General Permit, Section A(8).

18.     Discharge Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. The General Permit does not authorize the application of any mixing zones for complying with Receiving Water Limitation C(2).  As a result, compliance with this provision is measured at the Facility's discharge monitoring locations.

19.     In addition to absolute prohibitions and pollutant limitations, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent To Comply ("NOI").  The General Permit requires existing dischargers to have filed their NOIs before March 30, 1992.

20.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP").  The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  (Section B(3)).  The General Permit requires that an initial SWPPP have been developed and implemented before October 1, 1992.  The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities

COMPLAINT

5

that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (Section A(2)).  The SWPPP's BMPs must implement BAT and BCT (Section B(3)).  The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (Section A(4)); a list of significant materials handled and stored at the site (Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, and a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (Section A(6)).  The SWPPP must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (Section A(7), (8)).  The SWPPP must be evaluated annually to ensure effectiveness and must be revised where necessary (Section A(9),(10)).

21.     Section C(3) of the General Permit requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP. The report must be submitted to the Regional Board no later than 60 days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard. Section C(4)(a). Section C(11)(d) of the General Permit's Standard Provisions also requires dischargers to report any noncompliance. *See also* Section E(6).

22.     The General Permit requires dischargers commencing industrial activities before

October 1, 1992 to develop and implement a written monitoring and reporting program no later than October 1, 1992.  Existing facilities covered under the General Permit must implement all necessary revisions to their monitoring programs no later than August 1, 1997.

23.     As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  Dischargers must conduct visual observations of these discharge locations for at least one storm per month during the wet season (October through May) and record their findings in their Annual Report.  Dischargers must also conduct dry season visual observations to identify sources of non-storm water pollution.

24.     Dischargers must also collect and analyze storm water samples from at least two storms per year.  Section B(5)(a) of the General Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season.  All storm water discharge locations shall be sampled."  Section B(5)(c)(i) requires dischargers to sample and analyze during the wet season for basic parameters, including pH, total suspended solids, electrical conductance, and total organic compounds or oil & grease.  Section B(5)(c)(ii) requires dischargers to sample and analyze storm water for toxic chemicals and other pollutants likely to be in the storm water discharged from the facility.

25.     Section B(4)(a) of the General Permit requires dischargers to "visually observe storm water discharges from one storm event per month during the Wet Season (October 1 – May 30)."

26.     Section B.10.a.iii of the General Permit requires that the testing method employed in laboratory analyses of pollutant concentrations present in storm water discharged from an industrial facility be "adequate to satisfy the objectives of the monitoring program."  Permit Section B.10.a.iii.  Section B.2.a of the General Permit requires discharges to employ laboratory test methods that are adequate to, among other things, "ensure that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in this Permit."

COMPLAINT

7

27.     Section B(7)(a) indicates that the wet weather visual observations and samples must represent the "quality and quantity of the facility's storm water discharges from the storm event." Section B(7)(c) requires that "if visual observation and sample collection locations are difficult to observe or sample…facility operators shall identify and collect samples from other locations that represent the quality and quantity of the facility's storm water discharges from the storm event."

28.     Section B(14) of the General Permit requires dischargers to submit an annual report by July 1 of each year to the executive officer of the relevant Regional Board.  The annual report must be signed and certified by an appropriate corporate officer.  Sections B(14), C(9), (10).  Section A(9)(d) of the General Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Permit.  *See also* Sections C(9), C(10) and B(14).

29.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day per violation for all violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365.  *See also* 40 C.F.R. §§ 19.1 - 19.4.

30.     The Regional Board has established water quality standards for the Sacramento River and its tributaries in the Water Quality Control Plan for the Sacramento and San Joaquin River Basins, generally referred to as the Basin Plan.

31.     The Basin Plan provides that the pH "shall not be depressed below 6.5 nor raised above 8.5."

32.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life."

33.     The Basin Plan provides that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses."

COMPLAINT

34.     The Basin Plan establishes water quality objectives ("WQO") for several metals, including (at a hardness of 40 mg/L): copper – 0.01 mg/L; iron – 0.3 mg/L; and zinc – 0.1 mg/L.

35.     The Basin Plain requires that water designated for use as domestic or municipal supply shall not exceed the following maximum contaminant levels: aluminum – 1.0 mg/L (Maximum Contaminant Level – "MCL"), aluminum – 0.2 mg/L (Secondary MCL – "SMCL"), and iron – 0.3 mg/L (SMCL).

36.     The EPA has adopted a freshwater numeric water quality standard for zinc of 0.12 mg/L (Criteria Maximum Concentration – "CMC").  65 Fed.Reg. 31712 (May 18, 2000) (California Toxics Rule).

37.     EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. 73 Fed. Reg. 5657265 (Sep. 29, 2008); 65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  EPA has established Parameter Benchmark Values for the following parameters, among others: pH – 6.0 - 9.0 units; total suspended solids ("TSS") – 100 mg/L, oil and grease ("O&G") – 15 mg/L, iron – 1.0 mg/L, Nitrate + Nitrite as Nitrogen ("N+N") – 0.68 mg/L, zinc – 0.117 mg/L, aluminum – 0.75 mg/L, magnesium – 0.0636 mg/L, copper – 0.0636 mg/L, and manganese – 1.0 mg/L.  The State Board has also proposed adding a benchmark level for Specific Conductance of 200 μmhos/cm.

## V.     STATEMENT OF FACTS

38.     Defendant CDCR operates an industrial facility at 2100 Peabody Road in Vacaville, California.  The Facility falls within the Standard Industrial Classification ("SIC") Codes 3499 and 3272.  The Facility covers about 925 acres, the majority of which is used to house California State Prison inmates.  On information and belief, Plaintiff alleges that a variety of industrial activities occurs outside on both paved and unpaved portions of the Facility.

39.     Defendant channels, collects, and discharges storm water falling on the Facility to at least eight (8) storm water outfalls.  The Facility discharges storm water through natural and constructed channels that flow to Ulatis Creek, which then conveys that storm water into Cache Slough, which flows into the Sacramento River, which ultimately flows into the San Francisco Bay Delta.

COMPLAINT

40.     Plaintiff is informed and believes, and thereupon alleges, that industrial activities conducted at the Facility include the fabrication of metal parts, vehicle maintenance, pre-cast operations, sewage grinding, and the use and storage of heavy machinery and motorized vehicles. Industrial activities at the Facility also include the storage, fueling and maintenance of heavy machinery and motorized vehicle used to handle, store, manufacture and transport manufactured metal, vehicle, and related materials.

41.     Plaintiff is informed and believes, and thereupon alleges that the industrial activities at the site take place outside and are exposed to rainfall.  Loading and delivery of materials occurs outside.  Plaintiff is informed and believes, and thereupon alleges, that the storage areas are exposed to storm water and storm flows due to the lack of overhead coverage, berms, and other storm water controls.

42.     Trucks and other vehicles are operated at the Facility in areas exposed to storm water flows.  Plaintiff is informed and believes, and thereupon alleges, that such vehicles leak contaminants such as oil, grease, diesel fuel, and hydraulic fluids that are exposed to storm water flows, and that such equipment track sediment and other contaminants throughout the Facility. Trucks enter and exit the Facility directly from and to a public road.

43.     The management practices at the Facility are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.  The Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent rainfall and storm water flows from coming into contact with these and other exposed sources of contaminants.  The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated.  The Facility lacks adequate storm water pollution treatment technologies to treat storm water once contaminated.

44.     Plaintiff is informed and believes, and thereupon alleges that storm water flows easily over the surface of the Facility, collecting suspended sediment, dirt, metals, nitrates, and other pollutants as it flows toward the storm water drains.  Storm water and any pollutants contained in that storm water entering the drains flow directly to the Facility's outfalls which discharge directly into natural and constructed channels that flow to Ulatis Creek, which then conveys that storm water

1    into Cache Slough, which flows into the Sacramento River.

2         45.    Since at least December 8, 2010, Defendant has taken samples or arranged for

3    samples to be taken of storm water discharges at the Facility.  The sample and observation results

4    were reported by the Facility in its annual reports submitted to the Regional Board.  Defendant

5    certified each of those annual reports pursuant to Sections A and C of the General Permit.

6         46.    Since at least December 8, 2010, the Facility has detected TSS, zinc, N+N, iron, and

7    aluminum in storm water discharged from the Facility.  Since at least March 31, 2012, the Facility

8    has detected O&G in storm water discharged from the Facility.  Since at least November 21, 2012,

9    the Facility has detected pH in storm water discharged from the Facility.  Levels of these pollutants

10   detected in the Facility's storm water have been in excess of both numeric water quality standards

11   established in the Basin Plan and EPA's numeric parameter benchmark values.  Levels of pH

12   detected in the Facility's storm water have been in excess of numeric water quality standards

13   established in the Basin Plan.

14        47.    The following discharges of pollutants from the Facility have contained levels of pH

15   in excess of the numeric water quality standard established in the Basin Plan for pH of 6.5 – 8.5 s.u.

16   They have thus violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations

17   C(1) and C(2) and are evidence of ongoing violations of Effluent Limitation B(3) of the General

18   Industrial Storm Water Permit:

| Date | Discharge Point | Parameter | Concentration in Discharge | Basin Plan Water Quality Objective |
|------|-----------------|-----------|----------------------------|------------------------------------|
| 11/21/12 | Site 3 | pH | 5.66 s.u. | 6.50 - 8.50 s.u. (WQO) |
| 11/21/12 | Site 3 – Alt | pH | 5.65 s.u. | 6.50 - 8.50 s.u. (WQO) |

24        48.    The following discharges of pollutants from the Facility have contained levels of iron

25   in excess of the numeric water quality standard established in the Basin Plan for iron of 0.3 mg/L

26   (both WQO and SMCL).  They have thus violated Discharge Prohibitions A(1) and A(2) and

27   Receiving Water Limitations C(1) and C(2) and are evidence of ongoing violations of Effluent

28   Limitation B(3) of the General Industrial Storm Water Permit:

COMPLAINT

| Date | Discharge Point | Parameter | Concentration in Discharge | Basin Plan Water Quality Objective/ EPA California Toxics Rule |
|---|---|---|---|---|
| 12/08/10 | Site 1 | Fe | 2.3 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 12/08/10 | Site 2 | Fe | 5.3 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 12/08/10 | Site 3 | Fe | 6.6 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 12/08/10 | Site 4 | Fe | 6.9 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 12/08/10 | Site 5 | Fe | 5.6 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 12/08/10 | Site 6 | Fe | 6.7 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 12/08/10 | Site 7 | Fe | 25.0 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 12/08/10 | Site 8 | Fe | 2.7 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 1/23/12 | Site 1 | Fe | 3.44 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 1/23/12 | Site 2 | Fe | 2.77 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 1/23/12 | Site 3 | Fe | 9.95 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 1/23/12 | Site 4 | Fe | 7.65 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 1/23/12 | Site 5 | Fe | 1.93 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 1/23/12 | Site 6 | Fe | 2.47 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 1/23/12 | Site 7 | Fe | 37.8 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 1/23/12 | Site 8 | Fe | 14.4 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |

COMPLAINT

| 3/31/12 | Site 1 | Fe | 3.27 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
|---------|--------|-----|-----------|--------------------------------|
| 3/31/12 | Site 2 | Fe | 2.02 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 3/31/12 | Site 3 | Fe | 1.89 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 3/31/12 | Site 4 | Fe | 0.818 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 3/31/12 | Site 5 | Fe | 1.85 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 3/31/12 | Site 6 | Fe | 2.11 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 3/31/12 | Site 7 | Fe | 7.2 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 3/31/12 | Site 8 | Fe | 2.46 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 11/21/12 | Site 1 | Fe | 0.842 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 11/21/12 | Site 2 | Fe | 1.82 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 11/21/12 | Site 3 | Fe | 2.52 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 11/21/12 | Site 2 – Alt | Fe | 26.3 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 11/21/12 | Site 3 – Alt | Fe | 3.01 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 2/8/14 | Site 1 | Fe | 4.3 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 2/8/14 | Site 2 | Fe | 3.5 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 2/8/14 | Site 3 | Fe | 15.0 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 12/12/14 | Site 2 | Fe | 4.0 mg/L | 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |

49.   The following discharges of pollutants from the Facility have contained levels of zinc

in excess of the numeric water quality standard established in the Basin Plan for zinc of 0.1 mg/L (WQO) and 0.12 mg/L (CMC).  They have thus violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) and are evidence of ongoing violations of Effluent Limitation B(3) of the General Industrial Storm Water Permit:

| Date | Discharge Point | Parameter | Concentration in Discharge | Basin Plan Water Quality Objective/ EPA California Toxics Rule |
|---|---|---|---|---|
| 12/8/10 | Site 7 | Zn | 0.12 mg/L | 0.1 mg/L (WQO) 0.12 mg/L (CMC) |
| 1/23/12 | Site 4 | Zn | 7.65 mg/L | 0.1 mg/L (WQO) 0.12 mg/L (CMC) |
| 1/23/12 | Site 7 | Zn | 0.125 mg/L | 0.1 mg/L (WQO) 0.12 mg/L (CMC) |
| 11/21/12 | Site 2 – Alt | Zn | 0.151 mg/L | 0.1 mg/L (WQO) 0.12 mg/L (CMC) |

50.    The following discharges of pollutants from the Facility have contained levels of aluminum in excess of the numeric water quality standard established in the Basin Plan for aluminum of 1.0 mg/L (MCL) and 0.2 mg/L (SMCL).  They have thus violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) and are evidence of ongoing violations of Effluent Limitation B(3) of the General Industrial Storm Water Permit:

| Date | Discharge Point | Parameter | Concentration in Discharge | Basin Plan Water Quality Objective/ EPA California Toxics Rule |
|---|---|---|---|---|
| 12/08/10 | Site 1 | Al | 1.9 mg/L | 1 mg/L (MCL) 0.2 mg/L (SMCL) |
| 12/08/10 | Site 2 | Al | 4.8 mg/L | 1 mg/L (MCL) 0.2 mg/L (SMCL) |
| 12/08/10 | Site 3 | Al | 5.5 mg/L | 1 mg/L (MCL) 0.2 mg/L (SMCL) |
| 12/08/10 | Site 4 | Al | 6.1 mg/L | 1 mg/L (MCL) 0.2 mg/L (SMCL) |
| 12/08/10 | Site 5 | Al | 5.3 mg/L | 1 mg/L (MCL) 0.2 mg/L (SMCL) |

COMPLAINT

| 12/08/10 | Site 6 | Al | 6.2 mg/L | 1 mg/L (MCL) 0.2 mg/L (SMCL) |
|---|---|---|---|---|
| 12/08/10 | Site 7 | Al | 23.0 mg/L | 1 mg/L (MCL) 0.2 mg/L (SMCL) |
| 12/08/10 | Site 8 | Al | 2.5 mg/L | 1 mg/L (MCL) 0.2 mg/L (SMCL) |
| 1/23/12 | Site 1 | Al | 4.34 mg/L | 1 mg/L (MCL) 0.2 mg/L (SMCL) |
| 1/23/12 | Site 2 | Al | 2.9 mg/L | 1 mg/L (MCL) 0.2 mg/L (SMCL) |
| 1/23/12 | Site 3 | Al | 9.22 mg/L | 1 mg/L (MCL) 0.2 mg/L (SMCL) |
| 1/23/12 | Site 4 | Al | 7.53 mg/L | 1 mg/L (MCL) 0.2 mg/L (SMCL) |
| 1/23/12 | Site 5 | Al | 2.29 mg/L | 1 mg/L (MCL) 0.2 mg/L (SMCL) |
| 1/23/12 | Site 6 | Al | 2.97 mg/L | 1 mg/L (MCL) 0.2 mg/L (SMCL) |
| 1/23/12 | Site 7 | Al | 27.7 mg/L | 1 mg/L (MCL) 0.2 mg/L (SMCL) |
| 1/23/12 | Site 8 | Al | 11.5 mg/L | 1 mg/L (MCL) 0.2 mg/L (SMCL) |
| 3/31/12 | Site 1 | Al | 1.89 mg/L | 1 mg/L (MCL) 0.2 mg/L (SMCL) |
| 3/31/12 | Site 2 | Al | 1.51 mg/L | 1 mg/L (MCL) 0.2 mg/L (SMCL) |
| 3/31/12 | Site 3 | Al | 1.2 mg/L | 1 mg/L (MCL) 0.2 mg/L (SMCL) |
| 3/31/12 | Site 4 | Al | 0.543 mg/L | 0.2 mg/L (SMCL) |
| 3/31/12 | Site 5 | Al | 1.34 mg/L | 1 mg/L (MCL) 0.2 mg/L (SMCL) |
| 3/31/12 | Site 6 | Al | 1.42 mg/L | 1 mg/L (MCL) 0.2 mg/L (SMCL) |
| 3/31/12 | Site 7 | Al | 4.85 mg/L | 1 mg/L (MCL) 0.2 mg/L (SMCL) |

COMPLAINT

| 3/31/12 | Site 8 | Al | 1.78 mg/L | 1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
|---------|--------|-----|-----------|-------------------------------|
| 11/21/12 | Site 1 | Al | 0.648 mg/L | 0.2 mg/L (SMCL) |
| 11/21/12 | Site 2 | Al | 1.5 mg/L | 1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 11/21/12 | Site 3 | Al | 1.9 mg/L | 1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 11/21/12 | Site 2 – Alt | Al | 14.9 mg/L | 1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 11/21/12 | Site 3 – Alt | Al | 1.87 mg/L | 1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 2/8/14 | Site 1 | Al | 3.9 mg/L | 1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 2/8/14 | Site 2 | Al | 3.1 mg/L | 1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 2/8/14 | Site 3 | Al | 14.0 mg/L | 1 mg/L (MCL)<br>0.2 mg/L (SMCL) |

51.     The levels of TSS in storm water detected by the Facility have exceeded the benchmark value for TSS of 100 mg/L established by the EPA.  For example, on January 23, 2012, the level of TSS measured by Defendant in storm water discharged from one of the Facility's outfalls was 713 mg/L.  This level of TSS is over 7 times the benchmark value for TSS established by the EPA.  Defendant has also measured levels of TSS in storm water discharged from the Facility in excess of the EPA's benchmark value of 100 mg/L on November 21, 2012; March 31, 2012; and December 8, 2010.

52.     The levels of O&G in storm water detected by the Facility have exceeded the benchmark value for O&G of 15 mg/L established by the EPA.  On March 31, 2012, Defendant measured levels of O&G of 17.6 mg/L and 17.1 mg/L in storm water discharged from two of the Facility's outfalls.

53.     The levels of zinc in storm water detected by the Facility have exceeded the benchmark value for zinc of 0.117 mg/L established by the EPA.  For example, on January 23, 2012, the level of zinc measured by Defendant in storm water discharged from one of the Facility's

COMPLAINT

16

1    outfalls was 7.65 mg/L.  This level of zinc is over 65 times the benchmark value for zinc established

2    by the EPA.  Defendant has also measured levels of zinc in storm water discharged from the Facility

3    in excess of the EPA's benchmark value of 0.117 mg/L on November 21, 2012; and December 8,

4    2010.

5          54.     The levels of N+N in storm water detected by the Facility have exceeded the

6    benchmark value for N+N of 0.68 mg/L established by the EPA.  For example, on February 8, 2014,

7    the level of N+N measured by Defendant in storm water discharged from one of the Facility's

8    outfalls was 10 mg/L.  This level of N+N is almost 15 times the benchmark value for N+N

9    established by the EPA.  Defendant has also measured levels of N+N in storm water discharged from

10    the Facility in excess of the EPA's benchmark value of 0.68 mg/L in nearly every storm water

11    sample it has taken for the past five years, including November 21, 2012; March 31, 2012; January

12    23, 2012; and December 8, 2010.

13          55.     The levels of iron in storm water detected by the Facility have exceeded the

14    benchmark value for iron of 1.0 mg/L established by the EPA.  For example, on February 8, 2014,

15    the level of iron measured by Defendant in storm water discharged from one of the Facility's outfalls

16    was 15 mg/L.  This level of iron is 15 times the benchmark value for iron established by the EPA.

17    Defendant has also measured levels of iron in storm water discharged from the Facility in excess of

18    the EPA's benchmark value of 1.0 mg/L in nearly every storm water sample it has taken for the past

19    five years, including November 21, 2012; March 31, 2012; January 23, 2012; and December 8,

20    2010.

21          56.     The levels of aluminum in storm water detected by the Facility have exceeded the

22    benchmark value for aluminum of 0.75 mg/L established by the EPA.  For example, on February 8,

23    2014, the level of aluminum measured by Defendant in storm water discharged from one of the

24    Facility's outfalls was 14 mg/L.  This level of aluminum is almost 19 times the benchmark value for

25    aluminum established by the EPA.  Defendant has also measured levels of aluminum in storm water

26    discharged from the Facility in excess of the EPA's benchmark value of 0.75 mg/L in nearly every

27    storm water sample it has taken for the past five years, including November 21, 2012; March 31,

28    2012; January 23, 2012; and December 8, 2010.

COMPLAINT

57.     The levels of specific conductance in storm water detected by the Facility have exceeded the benchmark value for specific conductance of 200 μmhos/cm proposed by the State Board.  For example, on February 8, 2014, the level of specific conductance measured by Defendant in storm water discharged from one of the Facility's outfalls was 430 μmhos/cm.  This level of specific conductance is over twice the proposed benchmark value for specific conductance. Defendant has also measured levels of specific conductance in storm water discharged from the Facility in excess of the proposed benchmark value of 200 μmhos/cm on November 21, 2012; March 31, 2012; January 23, 2012; and December 8, 2010.

58.     Plaintiff is informed and believes, and thereupon alleges, that Defendant failed to collect and analyze storm water samples from all discharge points during at least two qualifying rain events at the Facility during four of the past five wet seasons, as required by the Permit.  During the 2010-2011, 2011-2012, 2012-2013 and 2013-2014 wet seasons, Defendant reported that the Facility sampled the first qualifying storm event of the season, when Plaintiff alleges that Defendant did not sample the first storm of the season during those four wet seasons.

59.     Plaintiff is informed and believes, and thereupon alleges, that Defendant failed to collect storm water samples from all discharge points during at least two qualifying rain events at the Facility during four of the past five wet seasons, as required by Section B(5)(a) of the General Permit.

60.     Plaintiff is informed and believes, and thereupon alleges, that Defendant failed to conduct all monthly visual observations of storm water discharges during the 2011-2012, 2012-2013, and 2013-2014 wet seasons as required by Section B(4)(a) of the General Permit.

61.     Plaintiff is informed and believes, and thereupon alleges, that during the 2010-2011, 2011-2012, 2012-2013, and 2013-2014 wet seasons, Defendant failed to comply with Section B.10.a.ii and Section B.2.a of the General Permit, by failing to employ appropriate, consistent, and adequate laboratory test methods to analyze storm water discharges from the Facility.

62.     Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed to and continues to fail to analyze its storm water samples for magnesium, copper, and manganese, which are pollutants that are likely to be present in significant quantities in the storm water

COMPLAINT

18

discharged from the Facility, in violation of Section B(5) of the General Permit.

63.     On information and belief, Plaintiff alleges that since at least March 11, 2010, Defendant has failed to implement BAT and BCT at the Facility for its discharges of pH, TSS, iron, N+N, zinc, aluminum, oil & grease and other un-monitored pollutants.  Section B(3) of the General Permit requires that Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992, or since the date the Facility opened.  As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

64.     On information and belief, Plaintiff alleges that since at least March 11, 2010, Defendant has failed to implement an adequate Storm Water Pollution Prevention Plan (SWPPP) for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not set forth site-specific best management practices for the Facility that are consistent with BAT or BCT for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not include an adequate assessment of potential pollutant sources, non-stormwater discharges, structural pollutant control measures employed by the Defendant, or an adequate description of best management practices to be implemented at the Facility to achieve BAT and BCT at the Facility.  According to information available to Plaintiff, Defendant's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not include each of the mandatory elements required by Section A of the General Permit.

65.     Information available to Plaintiff indicates that as a result of these violations, storm water containing excessive pollutants is being discharged during rain events from the Facility into channels that flow into Ulatis Creek, which then conveys that storm water into Cache Slough, which flows into the Sacramento River, which ultimately flows into the San Francisco Bay Delta.

66.     Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with Section A(9) of the General Permit.

67.     Plaintiff is informed and believes, and thereupon alleges, that Defendant failed to

COMPLAINT

submit to the Regional Board a true and complete annual report certifying compliance with the General Permit since at least March 11, 2010.  Pursuant to Sections A(9)(d), B(14), and C(9), (10) of the General Permit, Defendant must submit an annual report, that is signed and certified by the appropriate corporate officer, outlining the Facility's storm water controls and certifying compliance with the General Permit.  Plaintiff is informed and believes, and thereupon alleges, that Defendant has signed incomplete annual reports that purported to comply with the General Permit when there was significant noncompliance at the Facility.

68.    Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuous.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Failure to Implement the Best Available and
### Best Conventional Treatment Technologies
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

69.    Plaintiff re-alleges and incorporates the above paragraphs, as if fully set forth herein.

70.    The General Permit's SWPPP requirements and Effluent Limitation B(3) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  Defendant has failed to implement BAT and BCT at the Facility for its discharges of pH, TSS, iron, N+N, zinc, aluminum, oil & grease, and other unmonitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

71.    Each day since at least March 11, 2010, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

72.    Defendant has been in violation of the BAT/BCT requirements every day since March 12, 2010.  Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement BAT/BCT at the Facility.

COMPLAINT

## SECOND CAUSE OF ACTION
### Discharges of Contaminated Storm Water
### in Violation of Permit Conditions and the Act
### (Violations of 33 U.S.C. §§ 1311, 1342)

73.    Plaintiff re-alleges and incorporates the above paragraphs, as if fully set forth herein.

74.    Discharge Prohibition A(2) of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitations C(1) and C(2) of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

75.    Plaintiff is informed and believes, and thereupon alleges, that since at least December 8, 2010, Defendant has been discharging polluted storm water from the Facility in excess of applicable water quality standards in violation of the Discharge Prohibition A(2) of the General Permit.

76.    During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with pH, iron, zinc, aluminum, and other unmonitored pollutants at levels above applicable water quality standards. The storm water then flows untreated from the Facility directly into channels that flow into the San Joaquin River.

77.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

78.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

79.    Every day since December 8, 2010, that Defendant has discharged and continues to

COMPLAINT

21

discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

### THIRD CAUSE OF ACTION
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

80.     Plaintiff re-alleges and incorporates the above paragraphs, as if fully set forth herein.

81.     Section A and Provision E of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

82.     Defendant has failed to develop and implement an adequate SWPPP for the Facility. Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, inter alia, Defendant's outdoor storage of materials and finished products without appropriate best management practices; the continued exposure of significant quantities of industrial processes to storm water flows; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values and applicable water quality standards.

83.     Defendant has failed to adequately update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring.

84.     Each day since March 11, 2010, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

85.     Defendant has been in violation of the SWPPP requirements every day since March 11, 2010.  Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

### FOURTH CAUSE OF ACTION
**Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

86.     Plaintiff re-alleges and incorporates the above paragraphs, as if fully set forth herein.

87.     Section B of the General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992. Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility.  Defendant's ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by, *inter alia*, Defendant's failure to collect storm and analyze water samples from all storm water discharge locations at the Facility, failure to conduct all monthly visual observations of storm water discharges, and failure to employ appropriate laboratory test methods.

88.     Each day since March 11, 2010, that Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

### FIFTH CAUSE OF ACTION
**Failure to Properly Certify Compliance in Annual Report**
**(Violations of Permit Conditions and the Act, 33 U.S.C.  §§ 1311, 1342)**

89.     Plaintiff re-alleges and incorporates the above paragraphs, as if fully set forth herein.

90.     Defendant inaccurately certified compliance with the General Permit in each of the annual reports it has submitted to the Regional Board since at least March 12, 2010.

91.     Each day since at least March 11, 2010, that Defendant has either failed to submit a complete or correct report or falsely certified compliance with the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). Defendant continues to be in violation of the General Permit's certification requirement each day that it maintains its false certification of its compliance with the General Permit.

## VII.   RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.     Declare Defendant to have violated and to be in violation of the Act as alleged herein;

COMPLAINT

23

b.      Enjoin Defendant from discharging polluted storm water and non-storm water from the Facility unless authorized by the Permit;

c.      Enjoin Defendant from further violating the substantive and procedural requirements of the Permit;

d.      Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT and prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

e.      Order Defendant to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f.      Order Defendant to prepare a SWPPP consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

g.      Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

h.      Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

i.      Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

j.      Award any such other and further relief as this Court may deem appropriate.

Dated: May 11, 2015                    Respectfully submitted,

LAW OFFICES OF ANDREW L. PACKARD

By: _/s/ Andrew L. Packard_____
Andrew L. Packard
Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

COMPLAINT
24

**EXHIBIT A**



March 11, 2015

VIA CERTIFIED MAIL
<u>RETURN RECEIPT REQUESTED</u>

Jeffrey Beard, Secretary
California Department of Corrections & Rehabilitation
Office of Legal Affairs, Agent for Service of Process
1515 "S" Street, Suite 314 South
Sacramento, CA 95811

Donald Mims, Correctional Plant Manager
California State Prison Solano
2100 Peabody Road
Vacaville, CA 95687

Anita Hightower, Facility Operator Contact
California Department of Corrections – Solano State Prison
P.O. Box 187016
Sacramento, CA 95818

**Re:**     **<u>Notice of Violations and Intent to File Suit</u>**
          **<u>Under the Federal Water Pollution Control Act</u>**

Dear Mr. Beard, Mr. Mims and Ms. Hightower:

  I am writing on behalf of the California Sportfishing Protection Alliance ("CSPA") in regard to violations of the Clean Water Act ("the Act") occurring at the California Department of Corrections & Rehabilitation's Solano State Prison facility located at 2100 Peabody Road, Vacaville, California, 95687 ("the Facility"). The WDID number for the Facility is 5 S48I004100. CSPA is a non-profit public benefit corporation dedicated to the preservation, protection and defense of the environment, wildlife and natural resources of California waters, including New Alamo Creek, Ulatis Creek, Cache Slough the Sacramento River, and the San Francisco Bay Delta. This letter is being sent to you as the responsible owners, officers, or operators of the Facility. Unless otherwise noted, the California Department of Corrections &

Case 2:15-cv-01027-TLN-EFB   Document 1   Filed 05/12/15   Page 27 of 51
Notice of Violation and Intent To File Suit
March 11, 2015
Page 2 of 25

Rehabilitation, Jeffrey Beard, Donald Mims, and Anita Hightower shall hereinafter be collectively referred to as "Solano."

This letter addresses Solano's unlawful discharges of pollutants from the Facility to New Alamo Creek, which conveys that storm water through natural and constructed channels to Ulatis Creek, which then conveys that storm water into Cache Slough, which flows to the Sacramento River, which ultimately flows into the San Francisco Bay Delta.  Solano is in ongoing violation of the substantive and procedural requirements of the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ ("Permit").[1]  Section 505(b) of the Clean Water Act provides that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen must give notice of its intent to file suit.  Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the State in which the violations occur.  *See* 40 C.F.R. § 135.2.

As required by the Clean Water Act, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility. Consequently, the California Department of Corrections & Rehabilitation, Jeffrey Beard, Donald Mims, and Anita Hightower are hereby placed on formal notice by CSPA that, after the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, CSPA intends to file suit in federal court against the California Department of Corrections & Rehabilitation, Jeffrey Beard, Donald Mims, and Anita Hightower under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the Permit. These violations are described more fully below.

I.       **Background.**

        **A.  The Clean Water Act.**

Under the Act, it is unlawful to discharge pollutants from a "point source" to navigable waters without obtaining and complying with a permit governing the quantity and quality of discharges.  *Trustees for Alaska v. EPA*, 749 F.2d 549, 553 (9th Cir. 1984).  Section 301(a) of the Clean Water Act prohibits "the discharge of any pollutant by any person . . ." except as in compliance with, among other sections of the Act, Section 402, the NPDES permitting requirements.  33 U.S.C. § 1311(a).  The permit requirement extends to "[a]ny person who discharges or proposes to discharge pollutants. . . ."  40 C.F.R. § 122.30(a).

---

[1] On April 1, 2014, the State Board reissued the Permit, continuing its mandate that industrial facilities implement the best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT") and, in addition, establishing numeric action levels mandating additional pollution control efforts. State Board Order 2014-0057-DWQ.  The new permit, however, does not go into effect until July 1, 2015.  Until that time, the current General remains in full force and effect.

Notice of Violation and Intent To File Suit
March 11, 2015
Page 3 of 25

The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Pollutants are defined to include, among other examples, a variety of metals, chemical wastes, biological materials, heat, rock, and sand discharged into water. 33 U.S.C. § 1362(6). A point source is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). "Navigable waters" means "the waters of the United States" and includes, for example, traditionally navigable waters and tributaries to such waters. U.S.C. § 1362(7); 33 C.F.R. § 328.333 (a)(1)-(7). Navigable waters under the Act include man-made waterbodies and any tributaries or waters adjacent to other waters of the United States. *See Headwaters, Inc. v Talent Irrigation Dist.*, 243 F.3d 526, 533 (9th Cir. 2001).

CSPA is informed and believes, and thereupon alleges, that Solano has discharged, and continues to discharge, pollutants from the Facility to waters of the United States, through point sources, in violation of the terms of the Permit, every day that there has been or will be any measurable discharge of storm water from the Facility since at least April 6, 1992. Each discharge, on each separate day, is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). These unlawful discharges are ongoing. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Solano is subject to penalties for violations of the Act since February 17, 2010.

## B. Solano's Facility, Water Quality Standards, and EPA Benchmarks

The Facility is located at 2100 Peabody Road in the city of Vacaville and discharges directly to New Alamo Creek, which conveys that storm water through natural and constructed channels to Ulatis Creek, which then conveys that storm water into Cache Slough, which flows into the Sacramento River, which ultimately flows into the San Francisco Bay Delta. The Facility falls under Standard Industrial Classification ("SIC") Code 3499 (Fabricated Metal Products) and 3272 (Concrete Products, Except Block and Brick). Solano submitted a Notice of Intent ("NOI") to discharge under the Permit in 1992. CSPA's investigations into the industrial activities at Solano's approximately 925-acre Facility indicate that the Facility is primarily used to house California State Prison inmates.

The Facility also includes areas devoted to industrial activities including, but not limited to, fabricated metal parts, and vehicle maintenance, activities which require the Facility to handle, store, manufacture and transport manufactured metal, vehicle, and related materials. Other industrial activities at the Facility include pre-cast operations, sewage grinding, and the use and storage of heavy machinery and motorized vehicles, including trucks used to haul materials to, from and within the Facility. Solano collects and discharges storm water from the Facility through at least eight (8) discharge points into New Alamo Creek, which conveys that storm water through natural and constructed channels to Ulatis Creek, which then conveys that storm water into Cache Slough, which flows into the Sacramento River, which ultimately flows into the San Francisco Bay Delta. New Alamo Creek, Ulatis Creek, Cache Slough, the

Case 2:15-cv-01027-TLN-EFB   Document 1   Filed 05/12/15   Page 29 of 51
Notice of Violation and Intent To File Suit
March 11, 2015
Page 4 of 25

Sacramento River, and the San Francisco Bay Delta are waters of the United States within the meaning of the Clean Water Act.

The Central Valley Regional Water Quality Control Board ("Regional Board" or "Board") has established water quality standards for the Sacramento River and the Delta in the "The Water Quality Control Plan (Basin Plan) for the California Regional Water Quality Control Board, Central Valley Region – The Sacramento River Basin and The San Joaquin River Basin," generally referred to as the Basin Plan.[2]  The beneficial uses of the Sacramento River and its tributaries, including New Alamo Creek, Ulatis Creek and Cache Slough, include, among others, water contact recreation, non-contact water recreation, municipal and domestic water supply, endangered and threatened species habitat, shellfish harvesting, and fish spawning.  The non-contact water recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but where there is generally no body contact with water, nor any likelihood of ingestion of water.  These uses include, but are not limited to, picnicking, sunbathing, hiking, camping, boating, . . . hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities."  Basin Plan at II-1.00 – II-2.00.  Visible pollution, including visible sheens and cloudy or muddy water from industrial areas, impairs people's use of the Sacramento River for contact and non-contact water recreation.

The Basin Plan establishes water quality standards for the Sacramento River and its tributaries.  It includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life." For the Delta, the Basin Plan establishes water quality objectives for several metals, including (at a hardness of 40 mg/L): copper – 0.01 mg/L; iron – 0.3 mg/L; and zinc – 0.1 mg/L. $Id.$ at III-3.00, Table IIII-1.  $Id.$ at III-3.00. The Basin Plan also provides that "[t]he pH shall not be depressed below 6.5 nor raised above 8.5." $Id.$ at III-6.00.  The Basin Plan also prohibits the discharges of oil and grease, stating that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses." $Id.$ at III-5.00.

The Basin Plan also provides that "[a]t a minimum, [surface] water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) specified in the following provisions of Title 22 of the California Code of Regulations, which are incorporated by reference into this plan: Tables 64431-A (Inorganic Chemicals) and 64431-B (Fluoride) of Section 64431, Table 64444-A (Organic Chemicals) of Section 64444, and Table 64449-A (Secondary Maximum Contaminant Levels ["SMCLs"]-Consumer Acceptance Limits) and 64449-B (Secondary Maximum Containment Levels-Ranges) of Section 64449. This incorporation-by-reference is prospective, including future changes to the incorporated provisions as the changes take effect. $Id.$ at III-3.0.  It requires that water designated for use as domestic or municipal supply shall not exceed the following maximum contaminant levels: Aluminum – 1.0 mg/L.  $Id.$  Table 64431-A

---

[2] $See$ http://www.waterboards.ca.gov/centralvalley/water_issues/basin_plans/sacsjr.pdf.

Notice of Violation and Intent To File Suit
March 11, 2015
Page 5 of 25

provides an MCL for aluminum of 1.0 mg/L, Table 64449-A provides an SMCL for aluminum of 0.2 mg/L, for iron of 0.3 mg/L, and for zinc of 5.0 mg/L. The EPA has adopted a freshwater numeric water quality standard for zinc of 0.12 mg/L (Criteria Maximum Concentration – "CMC"). 65 Fed.Reg. 31712 (May 18, 2000) (California Toxics Rule). The EPA has also issued recommended water quality criterion MCLs, or Treatment Techniques, for Mercury - 0.002 mg/L; lead – 0.015 mg/L; Chromium – 0.1 mg/L; and, Copper – 1.3 mg/L.

The California Toxics Rule ("CTR"), issued by the EPA in 2000, establishes numeric receiving water limits for certain toxic pollutants in California surface waters. 40 C.F.R. § 131.**38.** The CTR establishes the following numeric limits for freshwater surface waters: Arsenic – 0.34 mg/L (maximum concentration); Chromium (III) – 0.550 mg/L (maximum concentration); Copper – 0.013 mg/L (maximum concentration); and Lead – 0.065 mg/L (maximum concentration).

The Regional Board has identified the waters of the Central Valley as failing to meet water quality standards for pollutant/stressors such as unknown toxicity, numerous pesticides, and mercury.[3] Discharges of pollutants into a surface water body may be deemed a "contribution" to an exceedance of the CTR, an applicable water quality standard, and may indicate a failure on the part of a discharger to implement adequate storm water pollution control measures. *See Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 375 F.3d 913, 918 (9th Cir. 2004); *see also Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 2005 WL 2001037 at *3, 5 (E.D. Cal., Aug. 19, 2005) (finding that a discharger covered by the Permit was "subject to effluent limitations as to certain pollutants, including zinc, lead, copper, aluminum and lead" under the CTR).

The EPA has published benchmark levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT").[4] Solano must analyze storm water samples for Total Suspended Solids (TSS), pH, Specific Conductance (SC), and Total Organic Carbon (TOC) or Oil and Grease (O&G). *See* Permit Section B(5)(c)(i). Solano must also test for Zinc (Zn), Nitrate + Nitrite (N+N), Iron (Fe), and Aluminum (Al). *See* Permit, Section B(5)(c)(i) - (iii) and at Table D, Sections E and AA. The following benchmarks have been established for pollutants discharged by Solano: Total Suspended Solids – 100 mg/L; pH – 6-9 mg/L; Iron – 1.0 mg/L; Nitrate + Nitrogen – 0.68 mg/L; Zinc – 0.117 mg/L; Aluminum – 0.75 mg/L; Oil & Grease – 15.0 mg/L. The State Water Quality Control Board has also proposed adding a benchmark level for Specific Conductance of 200 μmhos/cm. Additional EPA benchmark levels have been established for other parameters that CSPA believes are being discharged from the Facility, including but not limited to: Magnesium – 0.0636 mg/L, Copper - 0.0636 mg/L, and Manganese – 1.0 mg/L.

---

[3] *See* http://www.waterboards.ca.gov/water_issues/programs/tmdl/2010state_ir_reports/category5_report.shtml.
[4] The Benchmark Values can be found at: http://www.epa.gov/npdes/pubs/msgp2008_finalpermit.pdf, and http://cwea.org/p3s/documents/multi-sectorrev.pdf. (Last accessed on December 22, 2014).

Notice of Violation and Intent To File Suit
March 11, 2015
Page 6 of 25

II.     **Solano's Violations of the Permit.**

Based on its review of available public documents, CSPA is informed and believes that Solano is in ongoing violation of both the substantive and procedural requirements of the Clean Water Act, as discussed in detail below.

    **A.  Solano Has Discharged Storm Water Containing Pollutants in Violation of Effluent Limitation B(3), Discharge Prohibition A(2), and Receiving Water Limitations C(1) and C(2).**

The Permit prohibits any discharges of storm water associated with industrial activities that have not been subjected to BAT or BCT.  Effluent Limitation B(3) of the Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  Permit, Section A(8).  Conventional pollutants are Total Suspended Solids, Oil & Grease, pH, Biochemical Oxygen Demand, and Fecal Coliform.  40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional.  *Id*.; 40 C.F.R. § 401.15.

Further, Discharge Prohibition A(1) of the Permit provides:  "Except as allowed in Special Conditions (D.1.) of this Permit, materials other than storm water (non-storm water discharges) that discharge either directly or indirectly to waters of the United States are prohibited.  Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit."  Special Conditions D(1) of the Permit sets forth the conditions that must be met for any discharge of non-storm water to constitute an authorized non-storm water discharge.  Discharge Prohibition A(2) provides: "Storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance."

Receiving Water Limitation C(1) of the Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

Solano has discharged and continues to discharge storm water at unacceptable levels of Total Suspended Solids, pH, Iron, Nitrate + Nitrogen, Zinc, Aluminum, and Oil & Grease in violation of the Permit.  These high pollutant levels have been documented during significant rain events, including the rain events indicated in the table of rain data attached hereto as

Notice of Violation and Intent To File Suit
March 11, 2015
Page 7 of 25

Attachment A.[5]  Solano's Annual Reports and Sampling and Analysis Results confirm discharges of specific pollutants in violation of the Permit provisions listed above.  Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Facility have violated Effluent Limitation B(3), Discharge Prohibition A(2) and/or Receiving Water Limitations C(1) and C(2) of the Permit:

**1.     Discharge of Storm Water Containing Total Suspended Solids (TSS) at Concentration in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 12/08/10 | Site 7 | TSS | 120 mg/L | 100 mg/L |
| 1/23/12 | Site 3 | TSS | 103 mg/L | 100 mg/L |
| 1/23/12 | Site 4 | TSS | 118 mg/L | 100 mg/L |
| 1/23/12 | Site 7 | TSS | 714 mg/L | 100 mg/L |
| 1/23/12 | Site 8 | TSS | 241 mg/L | 100 mg/L |
| 3/31/12 | Site 7 | TSS | 140 mg/L | 100 mg/L |
| 11/21/12 | Site 2 – Alt | TSS | 174 mg/L | 100 mg/L |

**2.     Discharge of Storm Water Containing pH at Concentration in Outside of Applicable EPA Benchmark Value and Basin Plan Water Quality Objective.**

| Date | Discharge Point | Parameter | Concentration in Discharge | EPA Benchmark Value/ Basin Plan Water Quality Objective |
|---|---|---|---|---|
| 11/21/12 | Site 3 | pH | 5.66 s.u. | 6.00 - 9.00 s.u.(EPA Benchmark) 6.50 - 8.50 s.u. (WQO) |

---

[5] Storm water is discharged from the Facility on dates that include but are not limited to, when 0.1 inches of rain falls.

Case 2:15-cv-01027-TLN-EFB   Document 1   Filed 05/12/15   Page 33 of 51
Notice of Violation and Intent To File Suit
March 11, 2015
Page 8 of 25

| 11/21/12 | Site 3 – Alt | pH | 5.65 s.u. | 6.00 - 9.00 s.u.(EPA Benchmark) 6.50 - 8.50 s.u. (WQO) |

3.      **Discharge of Storm Water Containing Iron (Fe) at Concentration in Excess of Applicable EPA Benchmark Value, Basin Plan Water Quality Objective, and EPA California Toxics Rule.**

| Date | Discharge Point | Parameter | Concentration in Discharge | EPA Benchmark Value/ Basin Plan Water Quality Objective/ EPA California Toxics Rule |
|---|---|---|---|---|
| 12/08/10 | Site 1 | Fe | 2.3 mg/L | 1.0 mg/L (EPA Benchmark) 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 12/08/10 | Site 2 | Fe | 5.3 mg/L | 1.0 mg/L (EPA Benchmark) 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 12/08/10 | Site 3 | Fe | 6.6 mg/L | 1.0 mg/L (EPA Benchmark) 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 12/08/10 | Site 4 | Fe | 6.9 mg/L | 1.0 mg/L (EPA Benchmark) 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 12/08/10 | Site 5 | Fe | 5.6 mg/L | 1.0 mg/L (EPA Benchmark) 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 12/08/10 | Site 6 | Fe | 6.7 mg/L | 1.0 mg/L (EPA Benchmark) 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 12/08/10 | Site 7 | Fe | 25.0 mg/L | 1.0 mg/L (EPA Benchmark) 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 12/08/10 | Site 8 | Fe | 2.7 mg/L | 1.0 mg/L (EPA Benchmark) 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 1/23/12 | Site 1 | Fe | 3.44 mg/L | 1.0 mg/L (EPA Benchmark) 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 1/23/12 | Site 2 | Fe | 2.77 mg/L | 1.0 mg/L (EPA Benchmark) 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |

Notice of Violation and Intent To File Suit
March 11, 2015
Page 9 of 25

| 1/23/12 | Site 3 | Fe | 9.95 mg/L | 1.0 mg/L (EPA Benchmark)<br>0.3 mg/L (WQO)<br>0.3 mg/L (SMCL) |
|---------|--------|----|-----------|---------------------------------------------------------------|
| 1/23/12 | Site 4 | Fe | 7.65 mg/L | 1.0 mg/L (EPA Benchmark)<br>0.3 mg/L (WQO)<br>0.3 mg/L (SMCL) |
| 1/23/12 | Site 5 | Fe | 1.93 mg/L | 1.0 mg/L (EPA Benchmark)<br>0.3 mg/L (WQO)<br>0.3 mg/L (SMCL) |
| 1/23/12 | Site 6 | Fe | 2.47 mg/L | 1.0 mg/L (EPA Benchmark)<br>0.3 mg/L (WQO)<br>0.3 mg/L (SMCL) |
| 1/23/12 | Site 7 | Fe | 37.8 mg/L | 1.0 mg/L (EPA Benchmark)<br>0.3 mg/L (WQO)<br>0.3 mg/L (SMCL) |
| 1/23/12 | Site 8 | Fe | 14.4 mg/L | 1.0 mg/L (EPA Benchmark)<br>0.3 mg/L (WQO)<br>0.3 mg/L (SMCL) |
| 3/31/12 | Site 1 | Fe | 3.27 mg/L | 1.0 mg/L (EPA Benchmark)<br>0.3 mg/L (WQO)<br>0.3 mg/L (SMCL) |
| 3/31/12 | Site 2 | Fe | 2.02 mg/L | 1.0 mg/L (EPA Benchmark)<br>0.3 mg/L (WQO)<br>0.3 mg/L (SMCL) |
| 3/31/12 | Site 3 | Fe | 1.89 mg/L | 1.0 mg/L (EPA Benchmark)<br>0.3 mg/L (WQO)<br>0.3 mg/L (SMCL) |
| 3/31/12 | Site 4 | Fe | 0.818 mg/L | 0.3 mg/L (WQO)<br>0.3 mg/L (SMCL) |
| 3/31/12 | Site 5 | Fe | 1.85 mg/L | 1.0 mg/L (EPA Benchmark)<br>0.3 mg/L (WQO)<br>0.3 mg/L (SMCL) |
| 3/31/12 | Site 6 | Fe | 2.11 mg/L | 1.0 mg/L (EPA Benchmark)<br>0.3 mg/L (WQO)<br>0.3 mg/L (SMCL) |
| 3/31/12 | Site 7 | Fe | 7.2 mg/L | 1.0 mg/L (EPA Benchmark)<br>0.3 mg/L (WQO)<br>0.3 mg/L (SMCL) |
| 3/31/12 | Site 8 | Fe | 2.46 mg/L | 1.0 mg/L (EPA Benchmark)<br>0.3 mg/L (WQO)<br>0.3 mg/L (SMCL) |
| 11/21/12 | Site 1 | Fe | 0.842 mg/L | 0.3 mg/L (WQO)<br>0.3 mg/L (SMCL) |

Notice of Violation and Intent To File Suit
March 11, 2015
Page 10 of 25

| 11/21/12 | Site 2 | Fe | 1.82 mg/L | 1.0 mg/L (EPA Benchmark) 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
|---|---|---|---|---|
| 11/21/12 | Site 3 | Fe | 2.52 mg/L | 1.0 mg/L (EPA Benchmark) 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 11/21/12 | Site 2 – Alt | Fe | 26.3 mg/L | 1.0 mg/L (EPA Benchmark) 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 11/21/12 | Site 3 – Alt | Fe | 3.01 mg/L | 1.0 mg/L (EPA Benchmark) 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 2/8/14 | Site 1 | Fe | 4.3 mg/L | 1.0 mg/L (EPA Benchmark) 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 2/8/14 | Site 2 | Fe | 3.5 mg/L | 1.0 mg/L (EPA Benchmark) 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 2/8/14 | Site 3 | Fe | 15.0 mg/L | 1.0 mg/L (EPA Benchmark) 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |
| 12/12/14 | Site 2 | Fe | 4.0 mg/L | 1.0 mg/L (EPA Benchmark) 0.3 mg/L (WQO) 0.3 mg/L (SMCL) |

**4.    Discharge of Storm Water Containing Nitrate + Nitrite (N+N) at Concentration in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 12/8/10 | Site 1 | N+N | 1.4 mg/L | 0.68 mg/L |
| 12/8/10 | Site 3 | N+N | 3.2 mg/L | 0.68 mg/L |
| 12/8/10 | Site 4 | N+N | 3.6 mg/L | 0.68 mg/L |
| 12/8/10 | Site 5 | N+N | 2.1 mg/L | 0.68 mg/L |
| 12/8/10 | Site 6 | N+N | 2.2 mg/L | 0.68 mg/L |

Notice of Violation and Intent To File Suit
March 11, 2015
Page 11 of 25

| 12/8/10 | Site 7 | N+N | 5.7 mg/L | 0.68 mg/L |
|---------|--------|-----|----------|-----------|
| 12/8/10 | Site 8 | N+N | 1.9 mg/L | 0.68 mg/L |
| 1/23/12 | Site 1 | N+N | 1.57 mg/L | 0.68 mg/L |
| 1/23/12 | Site 2 | N+N | 1.07 mg/L | 0.68 mg/L |
| 1/23/12 | Site 3 | N+N | 0.77 mg/L | 0.68 mg/L |
| 1/23/12 | Site 4 | N+N | 0.78 mg/L | 0.68 mg/L |
| 1/23/12 | Site 7 | N+N | 1.82 mg/L | 0.68 mg/L |
| 3/31/12 | Site 3 | N+N | 1.3 mg/L | 0.68 mg/L |
| 3/31/12 | Site 4 | N+N | 1.01 mg/L | 0.68 mg/L |
| 3/31/12 | Site 5 | N+N | 1.4 mg/L | 0.68 mg/L |
| 3/31/12 | Site 6 | N+N | 1.07 mg/L | 0.68 mg/L |
| 3/31/12 | Site 7 | N+N | 4.38 mg/L | 0.68 mg/L |
| 11/21/12 | Site 1 | N+N | 1.78 mg/L | 0.68 mg/L |
| 11/21/12 | Site 3 | N+N | 0.72 mg/L | 0.68 mg/L |
| 11/21/12 | Site 2 – Alt | N+N | 1.15 mg/L | 0.68 mg/L |
| 11/21/12 | Site 3 – Alt | N+N | 1.73 mg/L | 0.68 mg/L |
| 2/8/14 | Site 1 | N+N | 10.0 mg/L | 0.68 mg/L |
| 2/8/14 | Site 2 | N+N | 2.2 mg/L | 0.68 mg/L |

Case 2:15-cv-01027-TLN-EFB   Document 1   Filed 05/12/15   Page 37 of 51
Notice of Violation and Intent To File Suit
March 11, 2015
Page 12 of 25

| 2/8/14 | Site 3 | N+N | 9.5 mg/L | 0.68 mg/L |

**5.**     **Discharge of Storm Water Containing Zinc (Zn) at Concentration in Excess of Applicable EPA Benchmark Value, Basin Plan Water Quality Objective, and EPA California Toxics Rule.**

| Date | Discharge Point | Parameter | Concentration in Discharge | EPA Benchmark Value/ Basin Plan Water Quality Objective/ EPA California Toxics Rule |
|---|---|---|---|---|
| 12/8/10 | Site 7 | Zn | 0.12 mg/L | 0.117 mg/L (EPA Benchmark)<br>0.1 mg/L (WQO)<br>0.12 mg/L (CMC) |
| 1/23/12 | Site 4 | Zn | 7.65 mg/L | 0.117 mg/L (EPA Benchmark)<br>0.1 mg/L (WQO)<br>0.12 mg/L (CMC) |
| 1/23/12 | Site 7 | Zn | 0.125 mg/L | 0.117 mg/L (EPA Benchmark)<br>0.1 mg/L (WQO)<br>0.12 mg/L (CMC) |
| 11/21/12 | Site 2 – Alt | Zn | 0.151 mg/L | 0.117 mg/L (EPA Benchmark)<br>0.1 mg/L (WQO)<br>0.12 mg/L (CMC) |

**6.**     **Discharge of Storm Water Containing Aluminum (Al) at Concentration in Excess of Applicable EPA Benchmark Value, Basin Plan Water Quality Objective, and EPA California Toxics Rule.**

| Date | Discharge Point | Parameter | Concentration in Discharge | EPA Benchmark Value/ Basin Plan Water Quality Objective/ EPA California Toxics Rule |
|---|---|---|---|---|
| 12/08/10 | Site 1 | Al | 1.9 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 12/08/10 | Site 2 | Al | 4.8 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 12/08/10 | Site 3 | Al | 5.5 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |

Notice of Violation and Intent To File Suit
March 11, 2015
Page 13 of 25

| | | | | |
|---|---|---|---|---|
| 12/08/10 | Site 4 | Al | 6.1 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 12/08/10 | Site 5 | Al | 5.3 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 12/08/10 | Site 6 | Al | 6.2 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 12/08/10 | Site 7 | Al | 23.0 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 12/08/10 | Site 8 | Al | 2.5 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 1/23/12 | Site 1 | Al | 4.34 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 1/23/12 | Site 2 | Al | 2.9 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 1/23/12 | Site 3 | Al | 9.22 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 1/23/12 | Site 4 | Al | 7.53 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 1/23/12 | Site 5 | Al | 2.29 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 1/23/12 | Site 6 | Al | 2.97 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 1/23/12 | Site 7 | Al | 27.7 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 1/23/12 | Site 8 | Al | 11.5 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 3/31/12 | Site 1 | Al | 1.89 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 3/31/12 | Site 2 | Al | 1.51 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |

Notice of Violation and Intent To File Suit
March 11, 2015
Page 14 of 25

| 3/31/12 | Site 3 | Al | 1.2 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
|---------|--------|----|----------|---------------------------------------------------------|
| 3/31/12 | Site 4 | Al | 0.543 mg/L | 0.2 mg/L (SMCL) |
| 3/31/12 | Site 5 | Al | 1.34 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 3/31/12 | Site 6 | Al | 1.42 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 3/31/12 | Site 7 | Al | 4.85 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 3/31/12 | Site 8 | Al | 1.78 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 11/21/12 | Site 1 | Al | 0.648 mg/L | 0.2 mg/L (SMCL) |
| 11/21/12 | Site 2 | Al | 1.5 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 11/21/12 | Site 3 | Al | 1.9 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 11/21/12 | Site 2 – Alt | Al | 14.9 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 11/21/12 | Site 3 – Alt | Al | 1.87 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 2/8/14 | Site 1 | Al | 3.9 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 2/8/14 | Site 2 | Al | 3.1 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |
| 2/8/14 | Site 3 | Al | 14.0 mg/L | 0.75 mg/L (EPA Benchmark)<br>1 mg/L (MCL)<br>0.2 mg/L (SMCL) |

Notice of Violation and Intent To File Suit
March 11, 2015
Page 15 of 25

7.      **Discharge of Storm Water Containing Oil & Grease (O&G) at Concentration in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|------|-----------------|-----------|----------------------------|-----------------|
| 3/31/12 | Site 2 | O&G | 17.6 mg/L | 15.0 mg/L |
| 3/31/12 | Site 3 | O&G | 17.1 mg/L | 15.0 mg/L |

8.      **Discharge of Storm Water Containing Specific Conductance (SC) at Concentration in Excess of Proposed Benchmark.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|------|-----------------|-----------|----------------------------|-----------------|
| 12/8/10 | Site 1 | SC | 1300 μmhos/cm | 200 μmhos/cm |
| 12/8/10 | Site 2 | SC | 1300 μmhos/cm | 200 μmhos/cm |
| 1/23/12 | Site 1 | SC | 515 μmhos/cm | 200 μmhos/cm |
| 1/23/12 | Site 1 | SC | 222 μmhos/cm | 200 μmhos/cm |
| 3/31/12 | Site 1 | SC | 1500 μmhos/cm | 200 μmhos/cm |
| 3/31/12 | Site 2 | SC | 520 μmhos/cm | 200 μmhos/cm |
| 3/31/12 | Site 3 | SC | 240 μmhos/cm | 200 μmhos/cm |
| 3/31/12 | Site 4 | SC | 376 μmhos/cm | 200 μmhos/cm |
| 3/31/12 | Site 5 | SC | 237 μmhos/cm | 200 μmhos/cm |
| 3/31/12 | Site 7 | SC | 203 μmhos/cm | 200 μmhos/cm |
| 11/21/12 | Site 1 | SC | 241 μmhos/cm | 200 μmhos/cm |

Case 2:15-cv-01027-TLN-EFB  Document 1  Filed 05/12/15  Page 41 of 51
Notice of Violation and Intent To File Suit
March 11, 2015
Page 16 of 25

| 2/8/14 | Site 1 | SC | 430 µmhos/cm | 200 µmhos/cm |
|--------|--------|----|--------------|--------------|
| 2/8/14 | Site 3 | SC | 270 µmhos/cm | 200 µmhos/cm |

The above samples demonstrate violations of Effluent Limitation B(3). CSPA's investigations, including a review of Solano's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of EPA's Benchmark values and the State Board's proposed benchmark level for Specific Conductivity, indicate that Solano has not implemented BAT and BCT at the Facility for its discharges of Total Suspended Solids, pH, Iron, Nitrate + Nitrogen, Zinc, Aluminum, and Oil & Grease in violation of Effluent Limitation B(3) of the Permit. Solano was required to have implemented BAT and BCT by no later than October 1, 1992 or the start of its operations. Thus, Solano is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.

The above samples also establish violations of Receiving Water Limitation C(1) of the Permit, because such discharges adversely impact human health or the environment, and Discharge Prohibition A(2) because the discharges cause or threaten to cause pollution, contamination or nuisance. The above samples may also constitute violations of Receiving Water Limitation C(2) of the Permit, with respect to the discharge of parameters for which Solano has failed to undertake testing and which cause or contribute to an exceedance of applicable water quality standards, including CTR limits.

CSPA is informed and believes that Solano has known that its storm water contains pollutants at levels exceeding EPA Benchmarks and other water quality criteria since at least February 17, 2010. CSPA alleges that such violations also have occurred and will occur on other rain dates, including during every single significant rain event that has occurred since February 17, 2010, and that will occur at the Facility subsequent to the date of this Notice of Violation and Intent to File Suit. Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges that Solano has discharged storm water containing impermissible levels of Total Suspended Solids, pH, Iron, Nitrate + Nitrogen, Zinc, Aluminum, Oil & Grease in violation Effluent Limitation B(3), Discharge Prohibition A(2) and Receiving Water Limitations C(1) and C(2) of the Permit.

These unlawful discharges from the Facility are ongoing. Each discharge of storm water containing any pollutants from the Facility without the implementation of BAT/BCT constitutes a separate violation of the Permit and the Act. Each violation in excess of receiving water limitations and discharge prohibitions is likewise a separate and distinct violation of the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Solano is subject to penalties for violations of the Permit and the Act since February 17, 2010.

Case 2:15-cv-01027-TLN-EFB   Document 1   Filed 05/12/15   Page 42 of 51
Notice of Violation and Intent To File Suit
March 11, 2015
Page 17 of 25

**B.      Solano Has Failed to Implement an Adequate Monitoring & Reporting Program.**

Section B of the Permit requires that dischargers develop and implement an adequate Monitoring and Reporting Program by no later than October 1, 1992 or the start of operations. Sections B(3), B(4) and B(7) require that dischargers conduct regularly scheduled visual observations of non-storm water and storm water discharges from the Facility and to record and report such observations to the Regional Board.  Section B(5)(a) of the Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season.  All storm water discharge locations shall be sampled."

Section B(5)(c)(i) further requires that the samples shall be analyzed for Total Suspended Solids, pH, Specific Conductance, and Total Organic Carbon.  Oil and Grease may be substituted for Total Organic Carbon.  Section B(5)(c)(ii) of the Permit further requires dischargers to analyze samples for all "[t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities."  Section B(10) of the Permit provides that "Facility operators shall explain how the Facility's monitoring program will satisfy the monitoring program objectives of [Permit] Section B.2."

Based on their investigations, CSPA is informed and believes that Solano has failed to develop and implement an adequate Monitoring & Reporting Program.  As an initial matter, based on their review of publicly available documents, CSPA is informed and believes that Solano has failed to collect storm water samples during at least two qualifying storms events, as defined by the Permit, during four of the past five Wet Seasons.  Second, based on its review of publicly available documents, CSPA is informed and believes that Solano has failed to conduct the monthly visual monitoring of storm water discharges and the quarterly visual observations of unauthorized non-storm water discharges required under the Permit during three of the past five Wet Seasons.  Furthermore, Solano has also failed to employ adequate testing methods in violation of the Permit, and failed to report the detection limits used in its sampling.

Finally, based on its review of publicly available documents, CSPA is informed and believes that Solano has failed to analyze samples for other pollutants that are likely to be present in significant quantities in the storm water discharged from the Facility including: Magnesium – 0.0636 mg/L, Copper – 0.0636 mg/L, and Manganese – 1.0 mg/L, and pH  – 6.0 -9.0 s.u.

Each of these failures constitutes a separate and ongoing violation of the Permit and the Act.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the Clean Water Act, Solano is subject to penalties for violations of the Permit and the Act since February 17, 2010.  These violations are set forth in greater detail below.

Notice of Violation and Intent To File Suit
March 11, 2015
Page 18 of 25

1.      **Solano Has Failed to Collect Qualifying Storm Water Samples At All Discharge Points During at Least Two Rain Events In Four of The Last Five Wet Seasons.**

      Based on its review of publicly available documents, CSPA is informed and believes that Solano has failed to collect storm water samples from all discharge points during at least two qualifying rain events at the Facility during four of the past five Wet Seasons, as required by the Permit.  This is so, even though there were many qualifying storm events from which to sample (discussed further below).

      In four of the past five Wet Seasons (2010-2011, 2011-2012, 2012-2013 and 2013-2014), Solano reported that the Facility sampled the first qualifying storm event of the season, when in fact it did not sample the first storm of the season during those four Wet Seasons.  For example, Solano reported in its 2010-2011 Annual Report that it sampled the first qualifying storm event of the Wet Season on December 8, 2010.  Based upon its review of publicly available rainfall data, CSPA is informed and believes that the first qualifying storm event of the 2010-2011 Wet Season occurred as early as October 24, 2010, when 1.47" of rain fell on the Facility.

      In addition, Solano reported in its 2012-2013 Annual Report that it only sampled from one qualifying storm event, even though there were numerous opportunities to sample such an event.  Further, in that same Annual Report, the storm event that Solano did sample was not a qualifying storm event.  Based on its review of publicly available rainfall data, CSPA is informed and believes that the storm that occurred at the Facility on November 21, 2012 was not a qualifying storm event because it rained 0.52" at the Facility on the day before.  Thus, the November 20, 2012 storm event rendered any storm occurring for three days afterwards non-qualifying.

      Furthermore, based on its investigation, CSPA is informed and believes that Solano failed to sample storm water discharges from the Facility at all discharge points during the 2013-2014 Wet Season. Solano reported during the previous three wet seasons (2010-2011, 2011-2012, 2012-2013) that there were eight (8) discharge points at the facility. However, in the most recent Annual Report (2013-2014), Solano reported that only three (3) discharge points were sampled. This failure to adequately monitor storm water discharges constitutes separate and ongoing violations of the Permit and the Act.  Permit, Section B (5)(a).

2.      **Solano Has Failed to Conduct the Monthly Wet Season Observations of Storm Water Discharges Required by the Permit.**

      The Permit requires dischargers to "visually observe storm water discharges from one storm event per month during the Wet Season (October 1 – May 30)."  Permit, Section B(4)(a).  As evidenced by the entries on Form 4 Monthly Visual Observations contained in Solano's Annual Reports for three of the last five Wet Seasons (2011-2012, 2012-2013 and 2013-2014), CSPA is informed and believes that Solano has failed to comply with this requirement of the Permit.

Specifically, Solano failed to conduct monthly visual observations of discharges from qualifying storm events for all months during three of the past five Wet Seasons as required by the Permit.  However, based on publicly available rainfall data, CSPA is informed and believes that there were many qualifying storm events during each of these Wet Seasons that Solano could have observed.

For example, Solano reported in its 2013-2014 Annual Report that it only conducted visual monitoring for the month of February.  However, based on its investigation of publicly available rainfall data, CSPA is informed and believes there were many qualifying storm events during which Solano could have visually monitored the discharge from the Facility.  *See* Attachment A.  Solano's failure to conduct this required monthly Wet Season visual monitoring extends back to at least February 17, 2010, and has caused and continues to cause multiple, separate and ongoing violations of the Permit and the Act.  Permit, Section B(4)(a).

**3.      Solano's Failure to Employ Adequate Testing Methods in Violation of the Permit Since February 17, 2010.**

Additionally, Solano is in violation of the Permit's requirement that the testing method employed in laboratory analyses of pollutant concentrations present in storm water discharged from the Facility be "adequate to satisfy the objectives of the monitoring program."  Permit Section B.10.a.iii.  In every single annual report filed by Solano, the test methods employed by the laboratory utilized by Solano to analyze the concentration of the pollutants present in the storm water discharged from its Facility did not comply with these Regional Board requirements.

Specifically, the detection limits Solano applied over past four Wet Seasons have differed dramatically every year leading to inaccurate or unreliable sample results that failed to meet the standard set forth in Section B.10.a.iii.  For example, the detection limit applied by Solano for iron in 2011, 2012 and 2014 was 0.04 mg/L, 11.5 mg/L and 0.1 mg/L, respectively.  Furthermore, Solano failed completely to report the detection limits used in its storm water samples in its 2013 Annual Report in violation of Permit requirements for filing accurate and complete Annual Reports, discussed further below.  These are just a few of many examples of Solano's failure to adequately test the presence and concentration of pollutants at their storm water discharge points.

Solano is in violation of the Permit for failing to employ laboratory test methods that are adequate to, among other things, "ensure that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in this Permit."  Permit, Section B.2.a. ("Monitoring Program Objectives").

CSPA is informed and believes that publicly available documents demonstrate Solano's consistent and ongoing failure to implement an adequate Monitoring and Reporting Program in violation of Section B of the Permit.  Accordingly, consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Solano is subject to penalties for these violations of the Permit and the Act since February 17, 2010.

Case 2:15-cv-01027-TLN-EFB   Document 1   Filed 05/12/15   Page 45 of 51
Notice of Violation and Intent To File Suit
March 11, 2015
Page 20 of 25

4.      **Solano's Failure to Analyze Storm Water Samples for All Required Constituents.**

In addition, CSPA is informed and believes that for four of the past five Wet Seasons, Solano has failed to analyze samples for other pollutants that are likely to be present in significant quantities in the storm water discharged from the Facility, including Magnesium – 0.0636 mg/L, Copper - 0.0636 mg/L, and Manganese – 1.0 mg/L.  Each failure to sample for all required constituents is a separate and distinct violation of the Permit and Clean Water Act. Accordingly, Solano is subject to penalties for these violations of the Permit and the Act since February 17, 2010.

**C.      Solano Has Failed to Implement BAT and BCT**.

Effluent Limitation B(3) of the Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  Permit, Section A(8).  CSPA's investigations, and the Facility's exceedances of EPA benchmarks explained above, indicate that Solano has not implemented BAT and BCT at the Facility for its discharges of Total Suspended Solids, pH, Iron, Nitrate + Nitrogen, Zinc, Aluminum, Oil & Grease and other unmonitored pollutants in violation of Effluent Limitation B(3) of the Permit.

To meet the BAT/BCT requirement of the Permit, Solano must evaluate all pollutant sources at the Facility and implement the best structural and non-structural management practices economically achievable to reduce or prevent the discharge of pollutants from the Facility.  Based on the limited information available regarding the internal structure of the Facility, CSPA believes that at a minimum Solano must improve its housekeeping practices, store materials that act as pollutant sources under cover or in contained areas, treat storm water to reduce pollutants before discharge (e.g., with filters or treatment boxes), and/or prevent storm water discharge altogether.  Solano has failed to adequately implement such measures.

Solano was required to have implemented BAT and BCT by no later than October 1, 1992.  Therefore, Solano has been in continuous violation of the BAT and BCT requirements every day since October 1, 1992, and will continue to be in violation every day that it fails to implement BAT and BCT.  Solano is subject to penalties for violations of the Permit and the Act occurring since February 17, 2010.

**D.      Solano Has Failed to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.**

Section A(1) and Provision E(2) of the Permit require dischargers of storm water associated with industrial activity to develop, implement, and update an adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992.  Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to the Permit to continue following their existing SWPPP and implement any necessary revisions to their SWPPP in a timely

Notice of Violation and Intent To File Suit
March 11, 2015
Page 21 of 25

manner, but in any case, no later than August 9, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the Facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (Permit, Section A(2)). The SWPPP must also include BMPs that achieve BAT and BCT (Effluent Limitation B(3)). The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (Permit, Section A(3)); a site map showing the Facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (Permit, Section A(4)); a list of significant materials handled and stored at the site (Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (Permit, Section A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (Permit, Section A(9),(10)). Receiving Water Limitation C(3) of the Permit requires that dischargers submit a report to the appropriate Regional Water Board that describes the BMPs that are currently being implemented and additional BMPs that will be implemented to prevent or reduce the discharge of any pollutants causing or contributing to the exceedance of water quality standards.

CSPA's investigations and reviews of publicly available documents regarding conditions at the Facility indicate that Solano has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above. Solano has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary. Accordingly, Solano has been in continuous violation of Section A(1) and Provision E(2) of the Permit every day since October 1, 1992, and will continue to be in violation every day that it fails to develop and implement an effective SWPPP. Solano is subject to penalties for violations of the Permit and the Act occurring since February 17, 2010.

E.     **Solano Has Failed to Address Discharges Contributing to Exceedances of Water Quality Standards.**

Receiving Water Limitation C(3) requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce the discharge of any pollutant in its storm water discharges that is causing or contributing

Case 2:15-cv-01027-TLN-EFB   Document 1   Filed 05/12/15   Page 47 of 51
Notice of Violation and Intent To File Suit
March 11, 2015
Page 22 of 25

to an exceedance of water quality standards.  Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP.

The report must be submitted to the Regional Board no later than 60-days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard.  Receiving Water Limitation C(4)(a).  Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance.  *See also* Provision E(6).  Lastly, Section A(9) of the Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

As indicated above, Solano is discharging elevated levels of Total Suspended Solids, pH, Iron, Nitrate + Nitrogen, Zinc, Aluminum, and Oil & Grease and other unmonitored pollutants that are causing or contributing to exceedances of applicable water quality standards.  For each of these pollutant exceedances, Solano was required to submit a report pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmarks and applicable water quality standards.

Based on CSPA's review of available documents, Solano was aware of high levels of these pollutants long before February 17, 2010.  Solano has been in continuous violation of Receiving Water Limitation C(4)(a) and Sections C(11)(d) and A(9) of the Permit every day since February 17, 2010, and will continue to be in violation every day it fails to prepare and submit the requisite reports, receives approval from the Regional Board and amends its SWPPP to include approved BMPs.  Solano is subject to penalties for violations of the Permit and the Act occurring since February 17, 2010.

**F.      Solano Has Failed to File Timely, True and Correct Reports.**

Section B(14) of the Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board.  The Annual Report must be signed and certified by an appropriate corporate officer.  Permit, Sections B(14), C(9), (10).  Section A(9)(d) of the Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the Permit.  *See also* Permit, Sections C(9) and (10) and B(14).

CSPA's investigations indicate that Solano has submitted incomplete Annual Reports and purported to comply with the Permit despite significant noncompliance at the Facility.  For example, Solano reported in four Annual Reports filed for the past four Wet Seasons (i.e., 2010-2011, 2011-2012, 2012-2013 and 2013-2014) that it observed storm water discharges occurring during the first storm of those Wet Seasons.  However, as discussed above, based on CSPA's review of publicly available rainfall data, CSPA believes this is incorrect.

Further, Solano failed to sample from qualifying storm events in four out of last five Wet Seasons in violation of the permit.  For example, in the 2012-2013 Annual Report Solano reported that it sampled from a storm event on November 21, 2012.  However, based on publicly

Notice of Violation and Intent To File Suit
March 11, 2015
Page 23 of 25

available rainfall data CSPA is informed and believes that it the storm that occurred at the Facility on November 21, 2014 was not a qualifying storm event because 0.52 inches of rain fell on the Facility on November 20, 2014. Thus, the November 20th storm event rendered any storm occurring for three days afterwards non-qualifying under the Permit.

These are but a few examples of how Solano has failed to file completely true and accurate reports.  As indicated above, Solano has failed to comply with the Permit and the Act consistently for the past five years; therefore, Solano has violated Sections A(9)(d), B(14) and C(9) & (10) of the Permit every time Solano submitted an incomplete or incorrect annual report that falsely certified compliance with the Act in the past five years.  Solano's failure to submit true and complete reports constitutes continuous and ongoing violations of the Permit and the Act.  Solano is subject to penalties for violations of Section (C) of the Permit and the Act occurring since February 17, 2010.

**IV.    Persons Responsible for the Violations.**

CSPA puts California State Prison Solano, the California Department of Corrections & Rehabilitation, Jeffery Beard, Donald Mims and Anita Hightower on notice that they are the persons and entities responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Jeffery Beard, Donald Mims, and Anita Hightower on formal notice that it intends to include those persons in this action.

**V.    Name and Address of Noticing Parties.**

The name, address and telephone number of each of the noticing parties is as follows: California Sportfishing Protection Alliance, Bill Jennings, Executive Director; 3536 Rainier Avenue, Stockton, CA 95204; Phone: (209) 464-5067

**VI.    Counsel.**

CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

Andrew L. Packard
Megan Truxillo
John J. Prager
LAW OFFICES OF ANDREW L. PACKARD
100 Petaluma Boulevard North, Suite 301
Petaluma, CA 94952
Tel. (707) 763-7227
Email: Andrew@PackardLawOffices.com

Notice of Violation and Intent To File Suit
March 11, 2015
Page 24 of 25

Michael R. Lozeau
Douglas J. Chermak
LOZEAU DRURY LLP
410 12th Street, Suite 250
Oakland, CA 94607
Tel: (510) 836-4200
E-mail: Doug@lozeaudrury.com

**VII.   Penalties.**

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects the California Department of Corrections & Rehabilitation, Jeffery Beard, Donald Mims, and Anita Hightower to a penalty of up to $37,500 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit.  In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees, including attorneys' fees.

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the Act against the California Department of Corrections & Rehabilitation, Jeffrey Beard, Donald Mims, and Anita Hightower for the above-referenced violations upon the expiration of the 60-day notice period.  If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Bill Jennings, Executive Director
California Sportfishing Protection Alliance

Notice of Violation and Intent To File Suit
March 11, 2015
Page 25 of 25

## <u>SERVICE LIST</u>

Gina McCarthy, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Jared Blumenfeld
Administrator, U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Eric Holder
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Thomas Howard, Executive Director
State Water Resources Control Board
1001 I Street Sacramento, CA 95814
P.O. Box 100
Sacramento, CA 95812-0100

Pamela C. Creedon, Executive Officer
Regional Water Quality Control Board
Central Valley Region
11020 Sun Center Drive, Suite 200
Rancho Cordova, CA 95670-6114

**ATTACHMENT A**
**Notice of Intent to File Suit, City of Solano**
**Significant Rain Events,* March 11, 2010 – March 11, 2015**

| | | |
|---|---|---|
| April 1, 2010 | October 5, 2011 | February 2, 2014 |
| April 5, 2010 | November 6, 2011 | February 6, 2014 |
| April 11, 2010 | November 11, 2011 | February 26, 2014 |
| April 12, 2010 | November 20, 2011 | February 27, 2014 |
| April 20, 2010 | December 12, 2011 | February 28, 2014 |
| April 21, 2010 | January 21, 2012 | March 1, 2014 |
| October 6, 2010 | January 23, 2012 | March 2, 2014 |
| October 19, 2010 | February 7, 2012 | March 26, 2014 |
| October 29, 2010 | February 13, 2012 | March 31, 2014 |
| October 30, 2010 | March 17, 2012 | April 1, 2014 |
| November 7, 2010 | March 18, 2012 | October 31, 2014 |
| November 19, 2010 | March 25, 2012 | November 1, 2014 |
| November 20, 2010 | March 31, 2012 | December 2, 2014 |
| November 21, 2010 | April 10, 2012 | December 3, 2014 |
| November 23, 2010 | April 11, 2012 | December 11, 2014 |
| December 5, 2010 | April 12, 2012 | December 12, 2014 |
| December 17, 2010 | April 13, 2012 | December 15, 2014 |
| December 18, 2010 | April 25, 2012 | December 16, 2014 |
| December 19, 2010 | October 22, 2012 | December 17, 2014 |
| December 20, 2010 | November 17, 2012 | December 19, 2014 |
| December 21, 2010 | November 30, 2012 | February 6, 2015 |
| December 22, 2010 | December 1, 2012 | February 8, 2015 |
| December 25, 2010 | December 2, 2012 | February 9, 2015 |
| December 29, 2010 | December 12, 2012 | |
| January 2, 2011 | December 15, 2012 | |
| January 30, 2011 | December 17, 2012 | |
| February 16, 2011 | December 22, 2012 | |
| February 18, 2011 | December 23, 2012 | |
| February 19, 2011 | December 24, 2012 | |
| February 25, 2011 | December 25, 2012 | |
| March 2, 2011 | December 26, 2012 | |
| March 18, 2011 | December 29, 2012 | |
| March 19, 2011 | January 5, 2013 | |
| March 20, 2011 | January 6, 2013 | |
| March 23, 2011 | January 24, 2013 | |
| March 24, 2011 | January 25, 2013 | |
| March 26, 2011 | February 8, 2013 | |
| April 7, 2011 | February 19, 2013 | |
| May 16, 2011 | February 20, 2013 | |
| May 17, 2011 | March 7, 2013 | |
| June 4, 2011 | March 31, 2013 | |
| June 5, 2011 | November 20, 2013 | |
| June 6, 2011 | November 29, 2013 | |
| October 4, 2011 | December 7, 2013 | |

* Dates gathered from publicly available rain and weather data collected at stations located near the
Facility.